## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

XAVIER JOHNSON,            *
                          *
    Plaintiff,          *
                          *
vs.                       *      CASE NO.:  2:05cv704-WKW
                          *
BIG 10 TIRES,             *
                          *
    Defendant.          *

### DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Big 10 Tires submits this Brief in support of its Motion for Summary Judgment.

**A.     Introduction**

Big 10 Tire Stores, Inc. operates retail tire stores in three states, including several in the Montgomery, Alabama area. Each store is under the supervision of a store manager who reports to a district manager (a/k/a area manager). All of the Montgomery area stores involved in this lawsuit are in the same Big 10 district and report to the same district manager.

Big 10 retail tire stores typically operate from 7:00 am to 6:00 p.m. or 7:00 p.m., six days per week. Saturday is typically Big 10's busiest day, with Mondays and Fridays a close second. Full time employees work 5 days per week with one day per week off (usually either Tuesday,

Wednesday, or Thursday). Part-time employees are used to fill-in when needed. Only full-time employees are eligible or company benefits.

Each retail store has a manager, mechanics (who do the more skilled mechanical work), and tire changers. Some stores, depending on volume, also have an assistant manager and/or a service manager. The assistant manager spells the store manager; their schedules are arranged so that one or the other is scheduled to work whenever the store is open (ideally). The manager, assistant manager, and service manager interrelate with the customers. The service manager (if present) diagnoses customer vehicles and performs test drives as necessary; this type of work is also done by the manager and the assistant manager (if present). The service manager schedules the work (regardless of who took the customer order), orders parts for outside vendors, and coordinates with and answers questions of both the mechanics and the tire changers.

Tire technician (a/k/a tire tech or tire changer) is the least skilled job in the store. Mechanic is a considerably more skilled job since it requires performing mechanical work on customer vehicles.

Plaintiff was hired as a full-time tire changer on April 22, 2003 at the Atlanta Highway store in Montgomery by Store Manager Billy Lynam. As a full-time employee Plaintiff started at 7:00 a.m. Deposition of Plaintiff at 68. At that time the area manager for Montgomery was Chuck Fuqua whose office was also located in the Atlanta Highway store where Plaintiff worked. Mr. Fuqua was replaced by Terry Troutman, with his office still in the Atlanta Highway store, on March 15, 2004.

2

Plaintiff had no prior automotive experience. Plaintiff for personal reasons did not want to work on Saturdays or begin work at the normal starting time of 7:00 a.m. Due to his resulting attendance and tardiness problems, he was reduced to part-time on March 29, 2004 and transferred to a different store (Madison Avenue) on April 15, 2004.

On May 19, 2004 Plaintiff filed an EEOC charge alleging among other things racial language by Billy Lynam, the store manager at the Atlanta Highway store *where he no longer worked.* The EEOC charge was served on Big 10 on Monday, May 24. The allegations of the charge were investigated by Big 10 President Don Kennemer the next day, Tuesday, May 25, and in more detail by Vice President Mike Burgess on that Friday, May 28. The store manager's employment was terminated that same day.

After the Madison Avenue store, Plaintiff worked at Zelda Road for Store Manager for Store Manager Bobby Ford, and he is now back at the Atlanta Highway Store working for Store Manager Don Day.[1] He has been working part-time all this time, but he claims to want to work full-time (but not on Saturdays or starting at the regular store starting time).

---

[1] Deposition of Plaintiff at pp. 11 (L. 22-23) -12 (L.1-3), 39 (L. 12-13), 49 (L. 5-7), 51 (L.19-22), and 51 (L. 23) - 52 (L. 1).

**B.**    **Claims**

Plaintiff makes several claims, all based on race discrimination: (1) hostile work environment, (2) discrimination in pay, (3) discriminatory denial of promotion to service manager, (4) reduction for full-time to part-time status, and (5) reduced hours of work.

While Plaintiff in his complaint *alleges* a good game, his *proof* is lacking. This is a motion for summary judgment, not a motion to dismiss.

**C.**    **Applicable Law**

**1.**    **Summary Judgment Standard**

"Summary judgment procedure is properly regarded *not as a disfavored procedural shortcut*, but rather as an integral part of the Federal Rules." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (emphasis added). "[T]he function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy . . . ." *Bland v. Norfolk & Southern R.R. Co.*, 406 F.2d 863, 866 (4th Cir. 1969). "One purpose of the allocation of burdens in Title VII . . . actions is to enable the district courts to identify meritless suits and dispense with them short of trial. Summary judgment, judiciously applied, is an appropriate vehicle for accomplishing this objective." *Foster v. Arcata Associates*, 772 F. 2d 1453, 1459 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986) (citations omitted). "The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (*en banc*).

Summary judgment is appropriate when

(1)    there is no **genuine** issue

(2)    as to any **material** fact

(3)    and the moving party is entitled to **judgment as a matter of law**.

*Fed.R.Civ.P.* 56(c) (emphasis added).

"A factual dispute is **'genuine'** if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir.1989) (emphasis added).

"A fact is **'material'** if it might affect the outcome of the suit under the governing substantive law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or are unnecessary will not be counted. . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Hawkins v. Ceco Corp.*, 883 F.2d 977, 980n.2 (11th Cir. 1989); *Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987).

The moving party would be entitled to **judgment as a matter of law** if, based on the evidence of record, no reasonable fact-finder could find for the non-moving party under the applicable substantive legal standards. "[S]ummary judgment should be granted where the

evidence is such that it 'would require a directed verdict for the moving party.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 and 249-51 (1986). Summary judgment should be denied only where the plaintiff has produced sufficient evidence that "reasonable minds could differ." *Holyfield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

The burden is on the moving party to show – to point out to the court – that there is no genuine issue of material fact, but thereafter the party with the burden of proof on a substantive issue at trial has the burden of proof on that issue on motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 327 (1986). "[T]he moving party simply has to 'show[] -- that is, point[] out to the district court -- that there is an absence of evidence to support the nonmoving party's case.'" *Celotex Corp. v. Catrett*, 477 U.S. at 325. "But . . . [there is] no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323.  "The non-moving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987).

A motion for summary judgment is not a motion to dismiss. "[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987). The plaintiff "must do more than *allege* pretext to make out a triable issue of fact." *Earley v. Champion International Corp.*, 907 F.2d 1077, 1084n.5 (11th Cir. 1990) (emphasis added).

6

The "opponent must do more than simply show ... some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "To survive summary judgment, the plaintiff must . . . present **concrete evidence** in the form of **specific facts** which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." 821 F.2d at 1081 (emphasis added). "If the evidence is *merely colorable,* or is not *significantly probative*, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50 (citations omitted) (emphasis added).


2.    **Hostile Environment**

The Eleventh Circuit has established these elements of a hostile environment claim:

> To establish a hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, an employee must show: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir.1999) (en banc).


*Gupta v. Florida Board of Regents*, 212 F.3d 571, 582-83 (11th Cir.2000) followed Mendoza and added:

> The fourth element-that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment"-is the element that tests the mettle of most sexual harassment claims. Requiring the plaintiff to prove that the harassment is severe or

pervasive ensures that Title VII does not become a mere "general civility code."

212 F.3d at 584.

In *Shields v. Fort James Corp.*, 167 F.Supp.2d 1322 (S.D.Ala.2001), *vacated on other grounds*, 305 F.3d 1280 (11th Cir. 2002) (vacating on a statute of limitations issue), Magistrate Judge (now Judge) Steele of the Southern District applied *Mendoza* and *Gupta* to a racial harassment case, holding:

> To prove a prima facie case of hostile work environment racial harassment, Plaintiffs must each establish that:(1) he belongs to a protected group; (2) he has been subjected to unwelcome racial harassment; (3) the harassment was based on his race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment; and (5) a basis for holding the employer liable.
>
> The fourth element, whether the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is the element that tests the legitimacy of most harassment claims and is therefore regarded as crucial. *See Gupta*, 212 F.3d at 583 ( citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The " 'mere utterance of an ⋯ epithet which engenders offensive feelings in an employee'⋯ does not sufficiently affect the conditions of employment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) ( quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)). Only when the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the [employee's] employment and create an abusive working environment," is the law violated. *Harris*, 510 U.S. at 21 ( quoting *Meritor*, 477 U.S. at 65-67).
>
> Accordingly, in order to establish that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment, the employee must make both a subjective and an objective showing. *Mendoza*, 195 F.3d at 1246. The employee must establish not only that he subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *Gupta*, 212 F.3d at 583, citing *Mendoza*, 195 F.3d at

8

1246. The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all of the circumstances. *Mendoza*, 195 F.3d at 1246, citing *Oncale v. Sundowner Offshore Services*, Inc., 523 U.S. 75, 81 (1998).

In determining whether the harassment objectively altered an employee's terms and conditions of employment, the following four factors should be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.*, citing *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997).

167 F. Supp.2d at1329-30 (some citations omitted). The court continued:

In order to create a hostile environment, "racial slurs spoken by co-workers have to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.' " *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995) ( quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990)). Moreover, as set forth above, only when a workplace is permeated with "discriminatory intimidation, ridicule, and insult," is it sufficiently severe or pervasive to alter the conditions of the employee's employment and create an abusive working environment. *Harris, supra.* . . .

167 F. Supp 2d at 1331.

3.    **Disparate Treatment**

"'Disparate treatment' . . . is the most easily understood type of discrimination.  The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.  Proof of discriminatory motive is critical . . . ." *Teamsters v. United States*, 431 U.S. 324, 335n.15 (1977). To prove disparate treatment "it is the plaintiff's

task to demonstrate that similarly situated employees were not treated equally." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 450 U.S. 248, 258 (1981).

In the leading case of *Chapman v. AI Transport*, 229 F.3d 1012(11th Cir. 2000) (*en banc*), the Eleventh Circuit, citing numerous cases, made these points:

> (1) "A plaintiff is not allowed to . . . substitute his business judgment for that of the employer."
>
> (2) "[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."
>
> (3) **"Federal courts '[d]o not sit as a super-personnel department that reexamines an entity's business decisions.** No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."
>
> (4)    "An 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'"
>
> (5)    "We 'do not ... second-guess the business judgment of employers.'"
>
> (6)    "We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair."

*Chapman v. AI Transport*, 229 F.3d at 1030 (citations and footnotes omitted) (emphasis added).

And in its earlier decision in *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998), the Eleventh Circuit held that plaintiff must prove that the articulated reason was false, not just that it was "unwise" or "bad business judgment." "Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is

pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer." *Id.* "Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'"[2]

These substantive legal principles apply to juries as well as the court. "[T]he jury [is not permitted] to examine an employer's reasons for discharge and determine that the employer's business judgment or policies do not appeal to its sensibilities."[3] "The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve."[4] "Whether [a certain] policy . . . is a good employment policy or a bad one or even a policy prohibited under other laws, Title VII does not prohibit employment decisions based on that policy provided the policy is applied equally to all employees."[5]

## 4.    Burden of Proof

*McDonnell Douglas*[6] and its progeny establish the burden of proof principles for disparate treatment cases. Plaintiff has to prove a prima facie case;[7] defendant has to articulate a

---

[2] *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir.), *cert. denied,* 519 U. S. 866 (1996) (citation omitted).

[3] *Elliott v. Group Medical & Surgical Service, Elliott v. Group Medical & Surgical Service,* 714 F.2d 556, 567 (5th Cir. 1983), *cert. denied,* 467 U.S. 1215 (1984).

[4] *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d at 1187, *quoting Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012n.6 (1st Cir. 1979) (ADEA).

[5] *Gilchrist v. Bolger,* 733 F.2d 1551, 1553 (11th Cir. 1984).

[6] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

non-discriminatory reason;[8] plaintiff then has to prove pretext.[9] The plaintiff *always* bears the ultimate burden of proving intentional discrimination.[10]  See generally *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir. 2000) *(en banc)*

**D.    Argument**

Plaintiff's various claims will be considered in turn.

---

[7]  *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576 (1978). "The establishment of a prima facie case is essentially a factual question particular to the circumstances of a given case [and] [t]he inquiry is whether an ordinary person could reasonably infer discrimination if the facts presented remained unrebutted." *Carter v. City of Miami,* 870 F.2d 578, 583 (11th Cir. 1989) (citations omitted).

[8]  If Plaintiff establishes a prima facie case, the "[d]efendant can *easily* rebut this presumption, however, by articulating some legitimate business reason for its actions." *Carter v. City of Miami,* 870 F.2d 578, 583 (11th Cir. 1989) (citations omitted).The employer's articulation burden is "exceedingly light." *Id.* at 583 (citations omitted).  It is a burden of articulation only, not a burden of persuasion. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256-58 (1981). The employer is not required to prove that it was actually motivated by the articulated reason, *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254; *Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000)(en banc),* nor is it required to prove the absence of discrimination.  *Board of Trustees v. Sweeney,* 439 U.S. 24, 25 (1978); *Elliott v. Group Medical & Surgical Service,* 714 F.2d 556, 566 (5th Cir. 1983), *cert. denied,* 467 U.S. 1215 (1984).

[9]  If the employer carries its articulation burden, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the Defendant's articulated reason is a pretext and the true reason was unlawful bias.  *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 254, 255 n.10, & 256-58; *Carter v. City of Miami,* 870 F.2d at 584.

[10]  *U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir. 1987).

**1.    Racially Hostile Work Environment**

Plaintiff's claim of a racially hostile work environment fails both because the alleged misconduct by Store Manager Lynam is insufficient as a matter of law and because it is undisputed that Plaintiff never complained of the misconduct. When Plaintiff filed an EEOC charge, the problem was *immediately* and *decisively* corrected.

Plaintiff's deposition testimony was as follows:

> A.    The first time that I noticed a racist environment was my second day or third day working with Big 10 Tires.
>
> Q.    What happened?
>
> A.    Lyman came into the shop and stated to me and another black tire tech that the tire tech that I was around was a nigger, but he works real hard, and he laughed.

Deposition of Plaintiff at p. 31(L. 14-21). The deposition testimony continued:

> Q.    All right. Did you complain to anyone with Big 10 at that time about the remark by Mr. Lyman?
>
> A.    No.

Deposition of Plaintiff at P. 33 (L. 3-6).

**There were no other racist comments by any Big 10 management.**

> Q.      … [W]ere there any other racist comments? . . . .
>
> A.      Not from Lyman.
>
> Q.      Okay.  Not from Mr. Lyman.  All right.  What about from anybody else?
>
> A.      Brian Stout.
>
> . . .
>
> Q.      What position was Mr. Stout in?
>
> A.      Mechanic.
> . . .
> Q.      . . . Any other racist comments, or have we covered them?
>
> A.      Not to my knowledge.
>
> Q.      All right.  Now, Mr. Stout, when he made those comments, did you complain to anybody at Big 10?
>
> A.      I personally did not complain.

Deposition of Plaintiff at pp. 33-35 (L. 17-23, L. 5-6, L. 7-13).[11] Plaintiff testified that Stout also made a second racist comment, but there were no complaints.  Deposition of Plaintiff at p. 37 (L. 14-16).

Other than the alleged comments of Lyman and the mechanic, there were no other racist comments. Deposition of Plaintiff at pp. 35 (L. 7-9), 39 (L. 14-16). After Plaintiff's transfer in

---

[11] Plaintiff's "belief" that a co-employ complained is clearly hearsay, and, in fact, a reading of his testimony shows that all that he really knows is that the co-employ and a company manager talked.  He does not know what was said.  Deposition of Plaintiff at p. 36 (L. 22-23).

April 2004 from the Atlanta Highway store to the Madison Avenue Store (Store Manager Wayne

Hoots, Deposition of Plaintiff at 43 (L. 17-19)), there were no racist comments at the Madison

Avenue store.  Deposition of Plaintiff at p. 39 (L. 14-16). Although he claimed that the manager

at Zelda Road, Bobby Ford, had a "retaliatory attitude", Plaintiff alleged no racial language,

Deposition of Plaintiff at p.37 (L. 17-18), nor did he ever complain about Mr. Ford's attitude,

Deposition of Plaintiff at 49-50 (L. 22-23, L. 1).[12] He is now back at the Atlanta Highway store

and has had no problem with the store manager there, Don Day. Deposition of Plaintiff at p.52

(L. 12-18).

Defendant is entitled to summary judgment on Plaintiff's racially hostile environment

claim for two reasons.  First, Plaintiff claims the use of an offensive racial term by one manager

of Big 10 on one occasion.  This was one epitaph by one manager, on one occasion, during a

term of employment with Big 10 that has lasted for 38 months. One such usage, while

reprehensible,[13] is not sufficient as a matter of law to create a racially hostile work environment.

In *Shields v. Fort James Corp.*, 167 F.Supp.2d 1322 (S.D.Ala.2001), *vacated on other

grounds*, 305 F.3d 1280 (11th Cir. 2002) (vacating on a statute of limitations issue), Judge Steele

granted summary judgment for the employer because a few racial slurs (even with the N word)

were not sufficient to create a "workplace . . . [so] permeated with 'discriminatory intimidation,

---

[12] "Personal animosity is not the equivalent of sex discrimination and is not
proscribed by Title VII.  The plaintiff cannot turn a personal feud into a sex
discrimination case by accusation." *McCollum v. Bolger*, 794 F.2d 602, 610 (11th
Cir. 1986), *cert. denied*, 479 U.S. 1034 (1987). Plaintiff has not proven, not even
claimed, that Bobby Ford was hostile to him because of his race.

[13] Big 10 cannot validly be accused of viewing the incident as anything less than reprehensible
since it cost the store manager his job.

ridicule, and insult,' . . . [as to be] sufficiently severe or pervasive to alter the conditions of the employee's employment and create an abusive working environment." 167 F. Supp. 2d at 1331, citing *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir.1995). In *Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir.1995), quoting *EEOC v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 (11th Cir.1990), the Eleventh Circuit said that in order to create a hostile environment, "racial slurs spoken by co-workers have to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.' " The alleged racial remarks in this case are even more "isolated remarks," 167 F. Supp. 2d at 1331-32, than those found insufficient in *Shields v. Fort James Corp.*[14]

The Court said: "While the isolated racial comments are certainly offensive, severe and even humiliating, they were not frequent, and Donald Shields' has presented no evidence that the conduct was physically threatening. Furthermore, there is no evidence before the Court that the racial remarks unreasonably interfered with or impaired Plaintiff's job performance." 167 F. Supp. 2d at 1332. The alleged[15] racial comments here were even more infrequent.

Plaintiff also alleges the use of offensive racial terms twice by a co-employee. **But Plaintiff admits never complaining about those alleged comments** by a co-employee. Obviously, racial comments by co-workers are of a different nature than racial comments by

---

[14] In *Shields v. Fort James Corp,* there were alleged racial comments by five co-workers, 167 F. Supp. 2d at 1330 (one co-employee) and 1331 (four co-employees) and one complaint to management (167 F. Supp. 2d at 1331).

[15] Taken as true, of course, on motion for summary judgment.

managers, and a company is not responsible for remarks by co-workers unless they have been brought to its attention and management subsequently fails to take reasonable remedial actions.

Vice President Burgess has submitted an affidavit stating that the first time that the alleged racial comments by Lyman was brought to the Company's attention was when Big 10 received Plaintiff's EEOC charge on May 24, 2005. Affidavit of Mike Burgess. This is, of course, consistent with Plaintiff's deposition testimony that he did **not** complain to Big 10 about Mr. Lyman's remark. Deposition of Plaintiff at P. 33 (L. 3-6).

Mr. Burgess' affidavit further states that the allegations in the EEOC charge were investigated the next day by company President, Don Kennemer, and then investigated in more detail himself three days later on Friday, May 28. On that same day, Mr. Lyman was told by Mr. Burgess that his employment was going to be terminated. Mr. Lyman then tendered his resignation, and it was accepted. Finally, the two alleged remarks by a co-employee are still fewer than the remarks found insufficient in *Shields v. Fort James Corp., supra.*

For both of these reasons, defendant is entitled to summary judgment on Plaintiff's racially hostile environment claim.

## 2.    Favoritism towards White Employees

Plaintiff's second claim is that black employees were generally treated worse than white employees. Deposition of Plaintiff at p. 33 (L. 12-15). This alleged "favoritism" toward white

employees appears to be a part of his hostile racial environment claim. *See* Deposition of Plaintiff at p. 33 (L. 10-15) and p. 40-42 (L. 11-23, L. 1-3, 9-16).

In any event, Plaintiff gave two examples of alleged favoritism toward white employees. Plaintiff, who has himself been disciplined for tardiness (Deposition of Plaintiff at 41, L. 1-5), alleges that black employees were disciplined for being absent or tardy where as white employees were not similarly disciplined. *See* Deposition of Plaintiff at pp. 40-41 (L. 21-23, L. 1-3). But Plaintiff admits that he never complained to management about this alleged favoritism in discipline toward white employees. Deposition of Plaintiff at p. 42 (L. 9-13).[16]

Furthermore, Plaintiff's only example of alleged favoritism in application of attendance/tardiness rules was based on alleged comments to him by employee John Starling, a white tire tech. Deposition of Plaintiff at p. 41-42 (L. 11-23, L. 1). But this is clearly inadmissible hearsay. John Starling is a tire tech, not a management employee, and his alleged statements are not binding on Big 10.

Therefore, Plaintiff has presented no admissible evidence that similarly situated white employees were not disciplined as he was. And Plaintiff admitted at his deposition that he had

---

[16] Confusingly, Plaintiff later said in his deposition that even though he had been tardy, he was never disciplined for it, even though there is written evidence to the contrary (Exhibit Q). So Plaintiff testified both that he had been disciplined for tardiness and that he had not been disciplined for tardiness. *Compare* Deposition of Plaintiff at 41 (L. 1-5) *with* Deposition of Plaintiff at 70 (L. 19-20), 80-82 (L.7-21, L. L. 21-22, L. 3-14). But if Plaintiff was not disciplined for being late/absent, why is he complaining about disparate application of the tardiness/attendance rules? He said John Starling (white) received more lenient treatment for tardiness (Deposition of Plaintiff at 41, L. 11-14) **compared to whom if it wasn't the Plaintiff himself?** In any event, it's all right with us if Plaintiff insists he was never disciplined because then he can hardly complain of disparate discipline in comparison to white employees.

never complained to Big 10 about white employees getting more lenient treatment. Deposition of Plaintiff at p. 42 (L. 9-13).

Plaintiff also claimed that at the Atlanta Highway store, when work was not busy, white employees were allowed to stand around, but black employees were given jobs such as sweeping up. Deposition of Plaintiff at p 37-38 (L. 19-23, L. 1-21). But Plaintiff admits that he never complained to management about this alleged favoritism toward white employees either. Deposition of Plaintiff at p. 40 (L. 8-10).

Plaintiff alleged that the favoritism toward white employees continued at the Madison Avenue store (Deposition of Plaintiff at p. 39, L. 17-21), but not after that (*id.* at 47-48, L. 21-23, L. 1-22), and that he had no complaints with his current Store Manager at the Atlanta Highway store, Don Day (*id.* at 52, L. 11-18).

Although Plaintiff said that there had been no favoritism at the Zelda Road store, his Store Manager there, Bobby Ford, had a "retaliatory attitude" because Ford had said that he would fire him, and Plaintiff believed that there was no reason to fire him. Deposition of Plaintiff at p. 49 (L. 5-9). **However, Plaintiff testified that Mr. Ford never said he why he would fire Plaintiff, took no disciplinary action against him, and Plaintiff never complained.** Deposition of Plaintiff at p. 49-50 (L. 17-23, L. 1).

Finally, Plaintiff also claims that he received fewer hours than he wanted (wanted at his own convenience, that is) and complains that at the Madison Avenue store a full-time white

employee received overtime while he (the Plaintiff) was relegated to part-time hours. Deposition of Plaintiff at 43 (L. 2-9), 47 (L. 15-20). This would seem to be a disparate treatment claim which is considered *infra*. To the extent it may be alleged as hostile environment, "assign[ment] [of] all overtime to white employees . . . cannot help establish that a hostile work environment exists or support a hostile work environment claim." 167 F. Supp. 2d at 1332 n.23.

Based on these slender reeds, no reasonable jury could conclude that Plaintiff has been subjected to a racially hostile work environment so severe as to "unreasonably interfere with his job performance," or that Big 10, once it was made aware of Plaintiff's claims through his EEOC charge, did not take prompt and effective remedial action. As stated by Judge Steele:

> Accordingly, the Court finds that the conduct at issue was not so objectively offensive and was not so severe or pervasive so as to alter the conditions of Donald Shields' employment. Even construing the evidence in the light most favorable to Donald Shields, the Court finds that Donald Shields' claim falls short of actionable hostile environment racial harassment under Eleventh Circuit case law. *See Mendoza* and *Gupta*, *supra*. Therefore, Defendant is also entitled to summary judgment in its favor as to Donald Shields' hostile environment racial harassment claim.

167 F. Supp. 2d at 1332.

3.    **Pay Discrimination**

Plaintiff's third claim is racial discrimination in pay.  Plaintiff alleges that he was started at $6.50 per hour, while some white employees were started at $7.00 per hour.  True; but some black employees during this period of time were started at $7.00 per hour and some white

employees were started at $6.50 per hour. Exhibit O to the Affidavit of Mike Burgess is a list of all persons hired as tire techs (called in Big 10 terminology Dept. # 11) in the Montgomery district from April 1, 2003 [Xavier Johnson was hired April 22, 2003] to the end of 2004. **Exhibit O shows five white employees hired as tire techs at $6.50 per hour, everyone of whom was hired after Mr. Johnson was hired. Exhibit O also shows fourteen black employees, plus two Hispanics, hired as tire techs at $7.00 per hour *or more*. Of the fourteen blacks, two were hired at $7.25, five at $7.50, and one at $8.25.** Whatever the reasons for the differences (which are not material in light of this pattern), there is obviously no racial pattern.

Plaintiff says that he was first interviewed by Don Day (the first day) and then later by Billy Lynam (the day he started work). Deposition of Plaintiff at p.11-12 (L. 7-10, L. 8-9). Plaintiff says inconsistently **both** that he never discussed starting pay with either Don Day (Deposition of Plaintiff at p. 11, L. 17-21) or Billy Lynam (Deposition of Plaintiff at p. 12, L. 22-23) **and** that he "understood" from Don Day that he would start at $7.00 per hour (Deposition of Plaintiff at p. 13, L. 5-19). In any event, **Billy Lynam gave him a raise to $7.00 per hour within about a month after he was hired** "so I would have the same starting rate as everyone else." Deposition of Plaintiff at p. 8 (L. 21-23), 13-14 (L. 22-23, L. 1), and 16 (L. 4-12).

Plaintiff next claims that he should have received further raises. He alleges that he asked Lyman for his "90 day raise" sometime in 2003;[17] Lynam said he couldn't give him the raise

---

[17] Ninety days for Plaintiff's date of hire would have been July 21, 2003; from the date of the $0.50 raise would have been about a month later.

because of the "monthly quota" but promised him a raise to $7.50 at the end of the year. Deposition of Plaintiff at p. 17 (L. 6-12).

Assuming Mr. Lyman did make such a promise,[18] there is no evidence that Mr. Lyman failed to carry out the promise because of Plaintiff's race or that his articulated reason to give Plaintiff a second immediate raise was a pretext for racial discrimination.[19]

Plaintiff testified that he also asked Store Manager Bobby Ford (Zelda Road) for a raise in the summer of 2004. Deposition of Plaintiff at p. 24 (L. 2-13). Except as discussed in the next paragraph, Plaintiff gives no comparators of "similarly situated white employees treated more favorably."

Plaintiff testified that white tire changers John Starling and Michael Cole were hired after him but were paid more ($7.50 per hour versus his $7.00). Deposition of Plaintiff at p.19-20 (L. 6-19, L. 5-15). These are Plaintiff's only two comparators. Deposition of Plaintiff at p.20 (L. 17-21).

John Starling was hired as a tire changer at the Atlanta Highway store (No. 26) on July 15, 2003 at $7.00 per hour (Exhibit G), and Michael Cole was hired on November 10, 2003 at

---

[18] Big 10 says the $0.50 raise was the 90 day raise, early, but Plaintiff's version must be taken as true on summary judgment.

[19] Since Plaintiff testified at his deposition that Mr. Lyman made him that promise, a material fact dispute is created, sufficient for the jury, but Plaintiff has offered no evidence to create a jury issue that his failure to receive the promised raise was due to his race. At most, the record is silent, but the burden is **on the Plaintiff** to prove a *prima facie* case.

$7.00 per hour (Exhibit I); Affidavit of Mike Burgess. **Plaintiff was already making $7.00 per hour as a tire changer on those date** and had been since May 26, 2003. Exhibit R.

Exhibit J shows that Michael Cole was raised to $7.50 per hour on May 13, 2004. Plaintiff was not similarly situated because, as of that time, Plaintiff had, as a result of his own voluntary choices,[20] been changed to part-time status.

John Starling was raised to $7.50 per hour on February 19, 2004 when Plaintiff was still full-time. Exhibit H. John Starling had a sterling work record and had received no disciplinary action at the time he received a $0.50 per hour raise. Affidavit of Mike Burgess. Plaintiff, in contrast, had two disciplinary write ups as of that date. See Exhibits Q and S. He had also developed a tardiness problem. See Exhibit P where we have high lighted the extraordinary number of times he clocked in after 7:00 a.m., and remember one of his rightups was for tardiness (Exhibit Q).[21]

Plaintiff testified at his deposition that, in his opinion, he should be making $8.00 to $8.50 per hour, but he introduces no comparative evidence. It is of course the plaintiff's burden

---

[20] We are not saying Plaintiff chose to be part-time; we are saying he **chose** not to work Saturdays and **chose** not to come to work until 8:00 or 8:30, instead of 7:00, and Big 10 chose not to create a special full-time job just for him with just those special conditions.

[21] Plaintiff claims he always called when he was going to be late. Deposition of Plaintiff at 79 (L. 22-23) and 81 (L. 1-17). *Not material; he was still late.* Employees who are late or absent and who don't call at all are likely to get fired. But calling in to report tardiness still doesn't excuse *excessive* tardiness (see Deposition of Plaintiff at p. 83, L. 1-3) and such employees are not going to be the first in line to get promotions and raises.

to prove that he was treated less favorably because of his race than similarly situated white employees. Plaintiff has not done so, and thus has not established a *prima facie* case.

Finally, as to his **current** pay rate, Plaintiff testified:

> Q.    What do you think that your rate should be presently?
>
> A.    $8.00-$8.50.
>
> Q.    And what do you base that on?
>
> A.    Yearly raises, work performance.
>
> **Q.    Anything else?**
>
> A.    **No**.

Deposition of Plaintiff at p. 21 (L. 11-17) (emphasis added).

## 4.    Denial of Promotion

Plaintiff alleges that he should have been promoted from tire changer to service manager a few months after he was hired. Deposition of Plaintiff at Pgs. 22-23 (L. 3-15, L. 2-11).[22] That is the only occasion on which Plaintiff has sought a promotion. Deposition of Plaintiff at p. 23 (L. 12-19) and p. 31 (L. 5-9).

---

[22] No date was given at Plaintiff's deposition, but Plaintiff did say that Kevin Cox was eventually hired for the job (Deposition of Plaintiff at p. 30, L. 13-18). Exhibit N shows that Cox was hired October 25, 2004. Since plaintiff testified that, when he asked Lynam about the job, Lynam said he was going to do it himself for awhile, Deposition of Plaintiff at 22 (L. 2-23) and p. 23 (L.4-11), Plaintiff could not have been working for Big 10 more that three or four months when he sought this promotion.

Plaintiff thought that he was qualified for the service manager position because he was computer literate and could order parts. Deposition of Plaintiff at p. 29 (L. 16-22). But service managers have to be familiar with all of the work being done in the shop, both work being done by the tire techs and work being done by the mechanics. They have to have tire tech and mechanic knowledge and experience. The service managers have to have experience in the automotive industry in order to be able to do this. Affidavit of Mike Burgess.

Attached as Exhibit A is the job description of Service Manager. It states as MINIMUM REQUIREMENTS: "Must have own tools; 1 year of automotive experience." "Must have tools" is a term of art referring to mechanics and mechanical knowledge.[23] Big 10 does not actually require service managers to have a set of mechanics tools but they must have sufficient mechanical knowledge or experience to be able to work with the mechanics as well as the tire techs. Affidavit of Mike Burgess. Plaintiff had never worked as a mechanic; he had never "fixed" cars; he had no automotive experience except washing and waxing cars.[24]

The JOB SUMMARY is: "Supervises tire changers; inspects vehicles for repairs needed; maintenance and efficient running of shop area." Plaintiff was barely experienced as a tire

---

[23] Big 10 does brake work, shock absorbers, alignment, and suspension and steering work as well as selling, installing, and adjusting tires. Affidavit of Mile Burgess.

[24] Plaintiff's work history was explored very thoroughly at his deposition. Deposition of Plaintiff at p.101-08. His experience consisted cooking in a Sonic Drive-In (p. 101, L. 10), temporary laborer work (p. 102, L. 3-5), demolition (p. 102, L. 20-23), packing, and shipping (p.103, L. 5. 14), warehouse/shipping (p. 104, L. 3, p. 105, L. 12-14) , moving (p. 104,), unloading trucks (p. 105-06, L. 21-5), and car washing/"detailing"  (p.107, L. 1-4).

changer; he certainly was not ready to "supervise" them.[25] He had **no** experience or background at all in "inspect[ing] vehicles for repairs needed." He was completely unqualified to give advice to mechanics. He had no supervisory experience which would be needed for the "efficient running of shop area."

Plaintiff testified that Kevin Cox eventually was hired for the service manger position that he (Plaintiff) had asked about. Deposition of Plaintiff at p. 30 (L. 18). Plaintiff knew nothing about his background. *Id.* (L. 21-23).

Mr. Cox originally was hired by Big 10 as an assistant manager on April 3, 2003 at $9.00 per hour. Exhibit K. He had prior automotive experience with two companies (Steve Lane's Truck and Auto Sales and Discount Tire). Exhibit L (résumé). He quit, eligible for rehire, on October 29, 2003. Exhibit M. He was rehired on October 25, 2004 at $8.00 per hour. Exhibit N.[26]

No reasonable jury could find that plaintiff was qualified for the service manager position or was denied promotion to service manager, a few months after he was hired as a tire tech with no automotive experience, because of his race.

---

[25] Plaintiff acknowledged that the service manager had to answer questions from the tire techs. Deposition of Plaintiff at p. 30 (L. 9-12). The service manager also had to answer questions form mechanics. Affidavit of Mr. Burgess.

[26] Exhibit N actually shows a job title of "assistant manager" but, as explained above, assistant managers and service managers frequently perform similar services, so Plaintiff is right that Cox was hired for the job that Plaintiff wanted.

5.    **Plaintiff's Reassignment to a Part-time Position Was the Result of His Own Voluntary Choices**

Big 10 is a retail tire store. Many customers bring their cars by the store early in the morning before their work. That is why the Big 10 day starts at 7:00 a.m. And Saturday is Big 10's busiest day.[27] Full-time employees are required to work on Saturday and to begin their work day at 7:00 a.m. Affidavit of Mike Burgess.

It is, of course, up to Big 10 what business practices to adopt. And Big 10 has adopted the business practices that it is open six days per week staring at 7:00 a.m. and that full-time employees have to work five days per week, one of which is always Saturday, and have to start at 7:00 a.m. Affidavit of Mike Burgess.

Plaintiff <u>asked</u> not to work Saturday because of another job (car detailing) he did that day. Deposition of Plaintiff at p. 53-54 (L. 23, L. 1-9). Plaintiff <u>asked</u> to come to work at 8:00 a.m. or 8:30 a.m., rather than the regular 7:00 a.m. starting time, because he needed to take one or more of his children to school. Deposition of Plaintiff at 68-69 (L. 7-23, L. 1-7).

In the spring of 2004, Plaintiff was having problems getting to work on time, presumably because of these child care needs. Exhibit P is a printout of Plaintiff's actual clock times from his date of hire through April 1, 2004 (when he was changed to part-time), highlighted to show

---

[27] Plaintiff denied in his deposition that Saturday was any busier than any other day ("same as every other day"). Deposition of Plaintiff at p. 54 (L. 12). This was a particularly ill-considered deviation from candor since it is not believable by anyone with common sense, much less by a reasonable jury.

every occasion on which Plaintiff clocked in after the 7:00 a.m. starting time (not counting his first day). **By my count, Plaintiff clocked in after the 7:00 a.m. starting time 179 out of 198 work days (96% of the time)!**[28] Even if you look at 8:00 a.m. or even 8:30 a.m., he was regularly late with appallingly frequency.[29]

As a result of these horrendous tardiness problems, Plaintiff had a conversation with first Lynam and then Lynam and Troutman, the result of which was that plaintiff was reduced to part-time and transferred to another store. Deposition of Plaintiff at p. 44-45 (L. 3-23, L. 1-12) and p. 53 (L. 9-19). Plaintiff disputes whether he had been warned for tardiness, but does not dispute that he had been tardy. Deposition of Plaintiff at p. 81-82 (L. 4-23, L. 1-2). He claimed he always called in if he was going to be late, but admitted that calling in did not make it acceptable. for him to be late regularly. Deposition of Plaintiff at p. 80-81 (L. 22-23, L. 1-17) and p. 83 (L. 1-3).

Plaintiff's claims that he called in to report being late and his claims that he had permission to be late regularly to drop off his children at school (deposition of Plaintiff at 68, L. 13-23) are not material. The issue here is why Big 10 involuntarily (taking Plaintiff's best case) moved him to part-time status on April 1, 2004, and the facts are clear beyond any reasonable doubt that it was because he could not (or would not) work a full-time schedule. Actually, the issue is whether plaintiff has presented "substantial evidence," sufficient to support a jury verdict in his favor, that Big 10's articulated reason for the change to part-time status is a pretext and that the real reason is Plaintiff's race. This argument cannot reasonably be credited by any

---

[28] I did not try to count days absent; I just compared the time on the days he actually clocked in.

[29] Exhibit P also shows that 38.7% of the hires were black; 43.2% were minorities (counting Hispanics). The 2000 census data shows the workforce in Montgomery County is 41.7 % black.

reasonable jury in light of Plaintiff's horrendous tardiness record and the statistics showing numerous black employees hired as tire changers, many at higher rates of pay than white tire changers.

There are some disputes about exactly what happened at this time, but those disputes are not material, and **these material facts are undisputed**:

(1)     Plaintiff's tardiness record (whether he called in or not) was horrendous.

(2)     Plaintiff did **not** want to work Saturdays (at all) and **agreed** with Mr. Troutman that he would not work Saturdays, Deposition of Plaintiff at p. 53-54 (L. 23, L. 1-9),[30] which is one of the reasons Troutman gave for moving Plaintiff to the Madison Avenue Store. Deposition of Plaintiff at 88-89 (L. 16-23, L. 1-3 ["And Saturdays off."]).

(3)     Plaintiff did **not** want to start work at 7:00 a.m. and **was accommodated**[31] by being allowed to come in at 8:00 a.m. or 8:30 a.m. Deposition of Plaintiff at p. 68-69 (L. 7-23, L. 1). "Me and Mr. Lynam discussed that I would be able to come in at 8, maybe 8:30." *Id.* at 68 (L. 15-17).

---

[30] "This situation was an agreement between me and Troutman." Deposition of Plaintiff at p. 54 (L. 2-3).

[31] The actual words were "for personal reasons" and "leniency." Deposition of Plaintiff at p. 68-69 (L. 22-23, L. 1-5).

(4)    There is no racial pattern in the assignment of starting pay to tire changers and no bias against hiring and employing blacks as tire techs.


**Under these undisputed facts no reasonable jury could find that Plaintiff was changed to part-time because of his race.**


Plaintiff was evasive in his testimony whether he understood that his insistence on working a special schedule would mean that he would have to be part-time, but even if that is a fact dispute, it is not material. This is not a breach of contract claim; a company does not have to have its employee's permission to implement company policy; and whether Plaintiff understood the consequences of his choices in advance is not the issue.[32] What is the issue is whether Plaintiff has shown any evidence – any substantial evidence -- that the Big 10 decision to offer Plaintiff only part-time work if Plaintiff insisted on not working Saturdays and not starting at 7:00 a.m. was racially motivated. It was Mr. Troutman who moved Plaintiff to Madison Avenue and who informed Plaintiff that "I would be receiving part-time work. That's all that Big 10 had to offer." Deposition of Plaintiff at 53 (L. 17-19). And there is **no** evidence that any similarly situated white employee was treated more favorably by Big 10.


By Plaintiff's own choice, he chose not to work on Saturday, and requested to be allowed to come in late between 8:00 to 8:30.  Plaintiff may have had good reasons for these choices.  He

---

[32] He obviously understood the consequences after a week or two (i.e., that he was not full-time), but he has never asked to go back to working on Saturdays or coming in at 7:00 a.m.

did not want to work on Saturday so that he could continue his lucrative car washing business.[33] And Plaintiff could not make it regularly by 7:00 a.m. because he had to take one or more of his several children to school. Both may be understandable, even laudable, choices made by the Plaintiff, but they were choices made by the Plaintiff.

Big 10's choice is that the self-imposed restrictions by plaintiff make him unsuitable for full-time work. Big 10 does not have to justify that decision. Company policies are for the company to decide, not juries. Only if Plaintiff shows that the Big 10 policy is racially discriminatory is Title VII implicated, and Plaintiff has not done so here.

Plaintiff has presented no evidence that any white employees have been allowed to be full-time who did not meet these requirements. Therefore, there is not a scintilla of evidence, much less substantial evidence, of any racial discrimination in Plaintiff being changed from full-time to part-time **because of his own choice not to work Saturday and not to begin work at 7:00 a.m.**

Big 10 has no obligation to create a full-time position, just to suit Plaintiff, that allows him to come in late and not work Saturdays. Big 10 sets the job requirements and the job schedules, and the employee either accepts it or not. Here, Plaintiff chose the only option suitable for his schedule, but then sues Big 10 because it did not create a special option just for him.

---

[33] Plaintiff testified that he was making $100-150 per week for only 8 hours work. Deposition of Plaintiff at p. 61-62 (L. 21-23 L. 1-4). This work is obviously much better paid than his job at Big 10 which might explain why he didn't want to work Saturdays.

Plaintiff said at his deposition that he could start a little earlier than 9:00 a.m. Deposition of Plaintiff at 69 (L. 19-23). **Not material.** He still has to drop his kids off at "[b]tween 7:30 and 7:40 every morning," Deposition of Plaintiff at 69 (L. 23), and full-time employees start at 7:00.

Q.     . . . But the other tire techs start at 7, don't they?

A.     Yes.

Deposition of Plaintiff at 69 (L. 3-15).

Although he "didn't see it that way." Plaintiff admitted that the full-time employees at Madison Avenue received the overtime; he didn't and *he was the only part-time employee.* Deposition at 66-67 (L. 19-23, L. 1-6). It is understandable why Plaintiff would have wished that the part-time employee (him) would have gotten some of the extra work, but it is up to the company to decide how to allocate extra hours. Big 10 elected to award it to its full-time employees. Big 10 also elected to award its full-time employees (35 hours) with benefits in preference to part-time employees who work only a fill-in schedule and who do not receive benefits. Affidavit of Burgess. That is Big 10's choice to make.[34]

After he was changed to part-time, Plaintiff says his regular schedule was 9:00 a.m. to 3:00 p.m. four days per week. Deposition of Plaintiff at p. 67 (L. 11-18). Big 10 claims that Plaintiff has consistently failed to work even that schedule, regularly turning down work.

---

[34] It may be "discrimination" in favor of full-time employees and against part-time employees, but it is not illegal discrimination.

Plaintiff disputes it, claiming that the company won't give him enough work. *The dispute is not material* because Plaintiff has introduced no evidence that his alleged adverse treatment with respect to hours is based on his race. The only management official as to whom Plaintiff has alleged racial language is Billy Lynam. And Billy Lynam was gone from Big 10 on May 24, 2004, less than two weeks after Plaintiff filed his EEOC charge (May 12, 2004). **And, after Plaintiff was transferred to Madison Avenue on April 15, 2004,[35] manager <u>other than Billy Lynam</u> were the ones assigning his hours.**

All Plaintiff has proven is that as a part-time employee (due to his own personal choices) he has received fewer hours that he would have as a full-time employee. That is not a violation of Title VII.

---

[35] Remember, it was Terry Troutman, not Billy Lynam, who moved Plaintiff to Madison Avenue on April 15, 2004.

**E.      Conclusion**


For these reasons, Defendant Big 10's Motion for Summary Judgment is due to be

granted.


                                    /s/ William C. Tidwell
                                    WILLIAM C. TIDWELL, III
                                    Attorney for Defendant
                                    Big 10 Tires, Inc.

OF COUNSEL:
HAND ARENDALL, L.L.C.
3000 AmSouth Bank Building
107 St. Francis Street (36602)
Post Office Box 123
Mobile, Alabama 36601
Telephone:    (251) 432-5511
Facsimile:    (251) 634-6375
Email:  btidwell@handarendall.com


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this _23_ day of June, 2006, I electronically filed the foregoing
pleading with the Clerk of the Court using the CM/ECF system which will send notifications of
such filing to the following:

<u>COUNSEL OF RECORD</u>:

Maricia D. Woodham, Esq.
Sabel & Sabel, P.C.
Hillwood Office Center
2800 Zelda Road, Suite 100-5
Montgomery, AL 36106


                                    /s/ William C. Tidwell